IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

THE PROCTER & GAMBLE COMPANY,

      Plaintiff,

  v.

GEORGIA-PACIFIC
CONSUMER PRODUCTS LP,

      Defendant.

Case No. 1:09-cv-318
JUDGE GREGORY L. FROST
Magistrate Judge Mark R. Abel

## OPINION AND ORDER

This matter is before the Court for consideration of a motion for a preliminary injunction (Doc. # 2) filed by Plaintiff, The Procter & Gamble Company, a memorandum in opposition (Doc. # 26) filed by Defendant, Georgia-Pacific Consumer Products, LP, and a reply memorandum (Doc. # 35) filed by Plaintiff. For the reasons that follow, this Court finds the motion not well taken.

### I. Background

The following recitation of the facts, which the Court has culled from the parties' evidentiary submissions and evidence presented at the July 8, 2009 preliminary injunction hearing, is set forth for the limited purpose of addressing the motion for a preliminary injunction. The parties should note that "findings of fact and conclusions of law made by a district court in granting a preliminary injunction are not binding at a trial on the merits." *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004) (citing *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).

Plaintiff, The Procter & Gamble Company, is purportedly the world's largest consumer goods company. Among Plaintiff's many products is the line of paper towels marketed under the brand name Bounty. This brand of paper towels is the top-selling brand in the marketplace, capturing approximately 40% of the paper towel market, and sales of these products amount to approximately $2 billion per year. The Bounty line is divided into three products, the product sold simply as Bounty (the main version of paper towel intended for everyday users), Bounty Basic (a less robust towel intended for the more infrequent user), and Bounty ExtraSoft (a towel that is designed to feel and work more like a cloth intended for niche users). Twenty to twenty-five percent of the towels sold feature prints or designs on them. Additionally, each line of paper towels has a different design or pattern embossed on them. The embossing is non-functional in that it serves no purpose other than constituting decorative enhancements designed to elicit specific reactions from or create particular impressions on consumers. Bounty features concentric diamonds, which Plaintiff's Eric Breissinger described as intended to convey "performance and durability." Bounty Basic features a hexagon pattern, intended to convey a "cleans up, holds up" impression to the consumer. Bounty ExtraSoft features an interlocking pattern of what Plaintiff describes as "bowties," intended to convey a "works and feels like a cloth" impression.

It is the last product, Bounty ExtraSoft, that is of particular import to the instant litigation. In January to February 2008, Plaintiff introduced the Bounty ExtraSoft product into the marketplace after a period of extensive development that cost $40 to $50 million. Within four months of its introduction, Bounty ExtraSoft had captured approximately 2% of the market, and by the end of its first year had generated North American sales exceeding $100 million. It is

2

important to note that the bowtie design embossed on the paper towels is visible through the clear portions of the product packaging and is featured in a pink highlighted print on the product label or logo portion of the packaging.

Defendant, Georgia-Pacific Consumer Products, LP, is a competitor of Plaintiff in the paper towel marketplace. Defendant manufactures the paper towel marketed under the brand name Brawny, which is the second best seller behind the Bounty brand. The Brawny line of paper towels captures a significantly lesser share of the marketplace than Bounty, however, with a marketshare just above approximately 5%.

Like many paper towels, Brawny also features decorative embossing. Previously, the product has featured a different pattern of embossing; from approximately 1999 until its redesign, the pattern featured what has been described as concentric or "scrubbing" circles and curved squares, with the former design element being the more dominant feature of the embossing pattern. Defendants eventually modified the embossing, however. In February 2008, Defendants introduced a redeveloped version of Brawny in response to steadily declining sales and concerns that one of its largest customers, Wal-Mart, would discontinue distribution of Brawny absent a product innovation leading to increased sales. The initial redevelopment plans included a change in the then-existing embossing, but according to Defendant's Terry Olson, Vice President and General Manager of Consumer Towels, Defendant was fiscally and logistically unable to implement desired embossing changes in time to meet its February 2008 release date of the redesigned product. Therefore, Olson asserted, Defendant elected to implement a new embossing pattern as part of the second phase of its introduction of the new Brawny to the market. Defendant subsequently implemented its new embossing design in April

2009. The design, described as a "patchwork design" and tracing its development back to 2002, incorporates the scrubbing circles and squares previously featured on Brawny paper towels and includes a bowtie shape that at first blush is similar to the Bounty ExtraSoft design when viewed in isolation from the circle components. The design is visible through the clear portions of the product packaging and is featured in a yellow-and-red highlighted print on the product label or logo portion of the packaging, serving as a backdrop to the Brawny badge.

This case involves a purported conflict arising from the embossing on Bounty ExtraSoft and on Brawny. Plaintiff claims that Brawny intentionally and willfully copied its bowtie design and that a likelihood of consumer confusion will result. Defendant denies such copying and argues that not only is there no likelihood of confusion, but that the dispute is simply a means by which Plaintiff can attack the Brawny relaunch in the marketplace. The dispute led to Plaintiff filing the instant action on May 8, 2009, asserting claims for (1) trademark infringement in violation of 15 U.S.C. § 1125(a); (2) violation of the Ohio Deceptive Trade Practices Act, Ohio Revised Code § 4165.02(A)(2) and (3); and (3) common law unfair competition in violation of Ohio law. (Doc. # 1.) Plaintiff also filed its motion for a preliminary injunction on that same date, seeking to enjoin Defendant from using the "bowtie" mark or any similar design for the duration of this litigation. (Doc. # 2.) The Court has accepted briefing and entertained one day of testimony on the issues involved, and the motion is now ripe for adjudication.

### III. Discussion

#### A. Standard Involved

As noted, this Court must decide whether Plaintiff is entitled to a preliminary injunction. The Sixth Circuit Court of Appeals has explained the consequent inquiry involved in such a

trademark case:

> The movant must show (a) irreparable harm, and (b) either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly toward the moving party.

*Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 651 (6th Cir. 1982), *cert. denied*, 459 U.S. 916 (1982). That court has also considered the two remaining elements of a traditional preliminary injunction inquiry: whether issuance of the preliminary injunction could harm third parties and whether issuance of the preliminary injunction would serve the public interest. *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985). None of these foregoing factors are prerequisites to be met; rather, these factors are to be balanced in a weighing of the equities involved. *Id*. (quoting *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)). This Court shall address each factor in turn.

**B.  Likelihood of Success on the Merits**

This case presents a simple question: Are Defendant's Brawny paper towels too similar to Plaintiff's Bounty ExtraSoft paper towels? If based on the evidence before the Court the likely answer to this question is yes, then Plaintiff is entitled to a preliminary injunction. If the likely answer is no, however, then no such injunctive relief is appropriate.

As noted, Plaintiff asserts a federal claim of unfair competition predicated on asserted trademark infringement. This claim rests on § 43(a) of the Lanham Act, which is codified at 15 U.S.C. § 1125(a). That statutory provision provides in pertinent part:

> **(1)** Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or

5

misleading description of fact, or false or misleading representation of fact, which--

**(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

**(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). Analysis under this statute will also address Plaintiff's claims of unfair competition under Ohio's common law and Ohio Rev. Code § 4165.02(A)(2) and (3), the Ohio Deceptive Trade Practices Act statute, because courts apply the same basic test. *See Stilson & Assocs., Inc. v. Stilson Consulting Group, LLC*, 129 F. App'x 993, 994 (6th Cir. 2005) ("The standard applicable to Lanham Act claims governs Plaintiffs' unfair competition, common law trade name infringement, and claims under the Ohio Deceptive Trade Practices Act–thus, success depends on whether Plaintiffs demonstrate a likelihood of confusion."); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 920 (6th Cir. 2003) ("Because trademark claims under Ohio law follow the same analysis as those under the Lanham Act, our discussion of the federal trademark claims will therefore encompass the state trademark claims as well"); *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 354-55 (6th Cir. 1998) (quoting *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 754 (6th Cir. 1998)). Thus, the key issue for these federal and state claims is whether there exists "a likelihood of confusion amongst customers due to the contemporaneous use of the parties' service marks in connection with the parties' respective services." *Allard Enters., Inc.*, 146 F.3d at 355.

Cognizant of the foregoing statutes and relevant case law, the Court turns to this core issue of whether a likelihood of confusion exists. The Sixth Circuit has set forth eight factors that guide the likelihood-of-confusion inquiry: (1) the strength of Plaintiff's mark; (2) the relatedness of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) Defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *See AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 792-93 (6th Cir. 2004); *Frisch's Restaurant, Inc.*, 759 F.2d at 1264; *Frisch's Restaurants, Inc.*, 670 F.2d at 648. None of these factors are dispositive. Rather, as the appellate court has explained,

> [t]hese factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely. They are also interrelated in effect. Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case . . . . *The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way*.

*AutoZone, Inc.*, 373 F.3d at 793. *See also Stilson & Assocs., Inc.*, 129 F. App'x at 997. The Court shall proceed to address each interrelated factor.

**Strength of Plaintiff's mark.** The Sixth Circuit Court of Appeals has stated that "[t]he strength of a mark is a factual determination of the mark's distinctiveness. The more distinct a mark, the more likely is the confusion resulting from its infringement, and, therefore, the more protection it is due." *Frisch's Restaurant, Inc.*, 759 F.2d at 1264. Further, as that court explained, " '[a] mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both.' " *Id*. (quoting

7

Callmann, *Unfair Competition, Trademarks & Monopolies*, ¶ 20.43 (4th ed. 1983)).

Defendant argues that Plaintiff possesses a weak mark because it is neither unique nor the subject of advertising focused on the mark. The bowties on either brand of paper towels involved here–as well as the bowtie shapes on many other brands of paper towels noted during the hearing and in the briefing–are hardly distinctive, whether inherently or by acquired character. One example presented at the hearing of a distinctive mark is the familiar Coke bottle, which has obtained an individualized character that the bowtie has not. Another example would be the unique Nike swoosh symbol, which by advertising and perhaps by its appearance has attained iconic stature in the marketplace. The bowties here lack such inherent distinctive and distinguishing character and cannot be regarded as iconic. Nor have they been marketed to obtain such secondary meaning. Accordingly, the bowtie shapes have not obtained cultural or marketplace significance to suggest one brand and only one brand. In other words, the ornamental bowtie design is fairly generic. The bowtie does not suggest the origin of the products, unlike marks that embody the corporate identity branding products such as those by Nike (the swoosh), Coke (the bottle), or Louis Vuitton (the interlocking L and V symbol). There is thus a dearth of evidence supporting a finding that Plaintiff has established a secondary meaning for its use of the bowtie design element–for example, no consumer surveys, no exclusive or longstanding use, no advertising specifically focused on the bowtie, no linking of the bowtie to sales, and no evidence of intentional copying as discussed below.

The evidence does suggests that the bowtie design element did not originate with Plaintiff and is in fact used by others, including companies selling products far removed from the paper towel context (*e.g.*, Birkentsock and Budweiser). Thus, the bowtie mark, viewed alone, is

8

a relatively weak mark. Plaintiff directs this Court to a bowtie pattern featured in a textbook as the source of the design element, while simultaneously rejecting Defendant's suggestion that the bowtie design was lifted or borrowed from the bowtie design featured on the soles of Birkenstock footwear. Plaintiff's Eric Breissinger testified that Plaintiff did not copy the Birkenstock pattern from the shoe company, despite the fact that documentary evidence indicates that during development, Plaintiff termed the bowtie design "Birkenstock." Breissinger suggested that Plaintiff used code names to label its patterns and that use of Birkenstock to describe the bowtie pattern does not suggest intentional copying of the shoe pattern by Plaintiff. This self-serving testimony is not credible. To accept the coincidence that Breissinger suggests would be to ignore both logic and common sense. Where there is smoke, there is fire, and where a company that has reproduced another company's design labels the copy *by the originating company's name*, it is hardly a strain to trace the development of the copy. In other words, this Court rejects the suggestion that Plaintiff developed the bowtie design from its Charmin product. The bowtie design is therefore not tied to Plaintiff and not unique or distinctive in the context employed here. This Court rejects Plaintiff's position that the bowtie is immediately recognizable to consumers as indicative of Bounty ExtraSoft.

**Relatedness of the goods.** The Sixth Circuit has identified the criteria involved in the relatedness factor: "First, if the parties compete directly, confusion is likely if the marks are sufficiently similar; second, if the goods and services are somewhat related, but not competitive, then the likelihood of confusion will turn on other factors; finally, if the products are unrelated, confusion is highly unlikely." *AutoZone, Inc.*, 373 F.3d at 797 (quoting *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 624 (6th Cir. 2003)). Thus, the appellate court has explained, "[t]he

9

relatedness inquiry therefore focuses on whether goods or services with comparable marks that are similarly marketed and appeal to common customers are likely to lead consumers to believe that they come from the same source, or are somehow connected with or sponsored by a common company." *Id.* (quoting *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 633 (6th Cir. 2002) (quotation omitted)). There is no question here that the goods involved in this litigation are similar, but this factor can hardly prove dispositive given the lack of similarity of the embossing involved and in light of the other factors to be examined.

**Similarity of the marks.** The Sixth Circuit has held that "in reviewing the similarity of marks the commercial context must be considered. . . . '[I]t is the effect upon prospective purchasers that is important.' " *Frisch's Restaurant, Inc.*, 759 F.2d at 1266 (quoting *McGregor-Doniger Inc. v. Drizzle, Inc.,* 599 F.2d 1126 (2d Cir. 1979)). This inquiry does not involve a simple towel sheet-to-towel sheet comparison. Rather, the Sixth Circuit has explained:

> "When analyzing similarity, courts should examine the pronunciation, appearance, and verbal translation of conflicting marks." [*Daddy's Junky Music Stores, Inc.,* 109 F.3d at 283.] A side-by-side comparison of the litigated marks is not appropriate, although naturally the commonalities of the respective marks must be the point of emphasis. Instead, "courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark." *Id.* (quotations omitted).

*AutoZone, Inc.*, 373 F.3d at 795. The correct approach is therefore to view the marks as a whole and not by the individual features of the marks. *See Therma-Scan, Inc.*, 295 F.3d at 634.

Correctly viewing the marks in their entirety–and considering them as presented alone–the Court concludes that there is only a mere possibility of confusion stemming from any similarity between the marks. The nature of the presentation of the marks serve as distinguishing

10

factors. *See AutoZone, Inc.*, 373 F.3d at 796. Plaintiff employs a design featuring interlocking bowties–almost a puzzle design–while Defendant utilizes a design consisting of prominent circles and curved squares set amid smaller bowtie shapes imbedded within larger bowtie shapes. Plaintiff would have this Court view the Brawny bowtie shapes separate from the Brawny scrubbing circles and curved squares, but to do so would impermissibly ignore the context within which the bowtie shapes appear. *Little Caesar Enter., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir. 1987) ("a trademark 'should not be split up into its component parts and each part then compared with parts of the conflicting mark to determine the likelihood of confusion. It is the impression which the mark as a whole creates on the average reasonably prudent buyer and not the parts thereof which is important.' " (quoting McCarthy, *Trademarks and Unfair Competition* § 23:15 (2d ed. 1984)).

Because the Brawny bowties are but a portion of a larger overall pattern, the bowtie design element must be taken in the proper context of the totality of the embossed design. Such consideration counsels against this factor weighing in favor of Plaintiff, because as the Sixth Circuit has explained, "[a] strong visual impression of dissimilarity ordinarily 'receives great weight in determining the likelihood of confusion.' " *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 648 (6th Cir. 2002) (quoting *Marketing Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 934 (6th Cir. 1999), *rev'd on other grounds*, 532 U.S. 23 (2001)). The court of appeals has held that " '[w]hat is important is not whether people will necessarily confuse the marks, but whether the marks will be likely to confuse people into believing that the goods . . . emanate from the same source.' " *Id.* (quoting *Kangol, Ltd. v. Kangaroos U.S.A., Inc.*, 974 F.2d 161, 163 (Fed. Cir. 1992)). The dissimilarities here mandate

that this factor favor Defendant.

**Evidence of actual confusion.**  It is well settled that "proof of actual confusion is not necessary to obtain injunctive relief in a Lanham Act case, but it is obviously the most probative proof of the likelihood of confusion." *Frisch's Restaurant, Inc.*, 759 F.2d at 1267.  There is simply no evidence of actual confusion in this case.

Plaintiff's Eric Breissinger testified as such, although he asserted that consumers *could* confuse the Bounty ExtraSoft and Brawny packages.  Breissinger admitted on cross-examination that Plaintiff had not conducted any consumer research on the perceived prominence of the bowtie on Brawny packaging.  According to Breissinger, Plaintiff had also not funded any survey examining whether consumers purchase Bounty ExtraSoft due to the bowtie embossing.  Nor, according to Breissinger, does Plaintiff have advertising explicitly directing consumers to look for the bowties as a means of finding Bounty ExtraSoft.  He asserted that the embossed design reinforces the marketed purpose of the product with consumers.  Breissinger could not point to any specific evidence of any lost Bounty ExtraSoft sales to Brawny and, in fact, testified that he thinks that Brawny's sales have continued to decline even after introduction of the patchwork embossing.

The parties are sharply divided on the results of two likelihood-of-confusion studies funded by Defendant and conducted by qualified expert Gerald Ford for purposes of this litigation.  Both studies or surveys employed the standard *Eveready* format.  One study examined post-sale confusion and featured two test cells.  The first cell consisted of the new Brawny presented outside its packaging, and the second, the old Brawny presented outside its packaging.  The other study examined point-of-sale confusion and also featured two test cells, again using

the new Brawny and the old Brawny, but presented in their packaging. Plaintiff asserts that by using old Brawny, Ford corrupted the data. Defendant of course disagrees, arguing that old Brawny was the best product for the control cells involved.

The dispute is essentially a red herring. If the results of the studies are valid, then they indicate the bowtie pattern is of little importance. The data suggests that the survey participants often guessed that the paper towels were attributable to Bounty, but never Bounty ExtraSoft, perhaps as a result of Plaintiff's dominance in the marketplace. Interestingly, participants often selected Bounty as the source of the towels involved, even when looking at a package with the Brawny logo and trade design. If the results of the study are invalid as corrupted, this Court must tread carefully in ignoring the data that Plaintiff deems useful while rejecting the data that Plaintiff argues is tainted. The end result would be that even disregarding the purportedly corrupted data, this Court is left with no persuasive evidence that the bowtie design element is associated with Bounty ExtraSoft. And if the Court were to ignore the studies in their entirety, there is absolutely no evidence properly suggesting the consumer confusion that Plaintiff posits exists.

**Marketing channels used.** This factor is concerned with " 'the parties' predominant customers and their marketing approaches. Where the parties have different customers and market their goods or services in different ways, the likelihood of confusion decreases.' " *AutoZone, Inc.*, 373 F.3d at 793 (quoting *Therma-Scan, Inc.,* 295 F.3d at 636). Here, the evidence indicates that Plaintiff markets its product through various methods employing diverse media, including mail advertising, the Internet, and television, newspaper, and magazine advertising. Defendant similarly engages the marketplace, although there was less specific

13

evidence in this regard. The companies' products are generally sold within the same aisle, but normally not side-by-side on a shelf. Although the parties dispute whether they are necessarily targeting the same potential customers, the Court discounts Defendant's dubious contention that it is targeting purchasers of the mainline Bounty product and Bounty Basic, but not Bounty ExtraSoft. Given the marketing channels employed, the Court finds that this factor weighs, if at all, in favor of Plaintiff.

**Likely degree of purchaser care.** In examining the degree of purchaser care involved, this Court remains cognizant that " 'the standard used by the courts is the typical buyer exercising ordinary caution.' " *AutoZone, Inc.*, 373 F.3d at 793 (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.,* 109 F.3d 275, 285 (6th Cir. 1997)). The evidence indicates that given the relatively low cost of the products involved and the nature of the products, a typical buyer will spend only seconds making a purchasing decision. Some confusion may result in light of the apparent indifference of the average consumer to such purchases at the price point involved. *See Therma-Scan, Inc.*, 295 F.3d at 638 (citing *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1111 (6th Cir. 1991)) (noting that as the cost or unusual nature of a purchase increases, the expectation of a higher degree of care involved in the purchase also increases). This factor weighs somewhat in Plaintiff's favor, although the Court recognizes that it is hardly dispositive of assessing a likelihood of confusion given the totality of the facts. *See Little Caesar Enter., Inc.*, 834 F.2d at 572 (essentially disregarding a district court's conclusions regarding the likely degree of purchaser care because "it probably makes little difference on the facts before [the court]").

**Defendants' intent in selecting the mark.** The Sixth Circuit has explained that "[i]f a

party chooses a mark with the intention of creating confusion between its products and those of another company, 'that fact alone may be sufficient to justify an inference of confusing similarity.' " *Therma-Scan, Inc.*, 295 F.3d at 638 (quoting *Daddy's Junky Music Stores*, 109 F.3d at 286 (citation omitted)). Thus, "[c]ircumstantial evidence of copying, particularly 'the use of a contested mark with knowledge of the protected mark at issue,' is sufficient to support an inference of intentional infringement where direct evidence is not available." *Id*. at 638-39 (quoting *Daddy's Junky Music Stores,* 109 F.3d at 286).

There is no evidence here that Defendant chose its patchwork design with the intention of creating confusion between Brawny and Bounty ExtraSoft. To the contrary, Defendant's Terry Olson repeatedly testified that as a result of 2008 testing involving five different patterns (two of which were private label designs), Defendant had concluded that its patchwork design was far preferred to the Bounty ExtraSoft design. Defendant's Joseph Miller also recalled that he thought there had been such consumer testing. Although Plaintiff has pointed to some evidence suggesting that at least a former executive for Defendant was concerned that the designs included similar shapes, there is no evidence that this belief was echoed by the decisionmakers at Defendant. In short, the Court credits the admittedly self-serving evidence presented by Defendants on this point and concludes that the lack of evidence of intentional infringement means that this factor carries no significant weight and is largely irrelevant to determining whether consumers will likely be confused in this case. *See id.* at 639 (citing *Daddy's Junky Music Stores,* 109 F.3d at 287).

**Likelihood of expansion of the product lines.** The Sixth Circuit "has explained that although evidence that either party will likely expand its product lines supports finding a

likelihood of confusion, '[a] finding that the parties will not expand their marks significantly . . . does not address the ultimate issue of likelihood of confusion.' " *Therma-Scan, Inc.*, 295 F.3d at 639 (quoting *Daddy's Junky Music Stores*, 109 F.3d at 287) (internal quotation marks and citation omitted)). Consequently, given the relative dearth of testimony or other evidence on concrete as opposed to merely possible plans for expansion, this Court cannot say that this factor weighs in favor of either party.

Taking all of the foregoing factors into account, however, the Court concludes that the significant weight of the factors considered are in favor of concluding that consumer confusion is not likely to occur. Although the goods are related, the parties use common marketing channels to target consumers, and there is a relatively low degree of purchaser care, the balance of the remaining factors weigh against a likelihood of confusion. The touchstone question is "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *AutoZone, Inc.*, 373 F.3d at 801 (quoting *Homeowners Group, Inc.*, 931 F.2d at 1107). Accordingly, based on the limited evidence before the Court, the Court must conclude that Plaintiff is unlikely to prevail on the merits and has, in fact, failed to present sufficiently serious questions going to the merits to make them fair ground for litigation with a balance of hardships tipping decidedly in Plaintiff's favor.

**C. Irreparable Injury**

To prevail on its motion, Plaintiff must demonstrate that it will suffer irreparable injury in the absence of an injunction. Plaintiff's Eric Breissinger described the company's potential harm in the absence of injunctive relief as lost sales resulting from the different performance profiles of Bounty ExtraSoft and Brawny. He explained that if a consumer were to purchase

Brawny and attribute its performance to Bounty ExtraSoft, the consumer would be disappointed and Plaintiff would lose a future purchase when that consumer then declined to buy Bounty ExtraSoft. The Court recognizes that Plaintiff has presented a theoretical but notable concern over the harm it could incur.

### D. Balancing of Harms

The third factor that the Court must consider is whether issuance of the requested injunction will cause substantial harm. In considering this factor, the Court must (1) balance the harm Plaintiff would suffer if its request for a preliminary injunction were denied against the harm Defendant would suffer if an injunction were to issue, and (2) assess the impact the preliminary injunction might have on relevant third parties. *See Corporate Express Office Prods. v. Warren*, Nos. 01-2521 DBRE & 01-2667 DBRE, 2002 WL 1901902, at *27 (W.D. Tenn. May 24, 2002). This Court has already discussed above the asserted harm that Plaintiff fears it would suffer in the absence of an injunction. Therefore, the Court now turns to the harm that Defendant and other parties might suffer as a result of an injunction.

Defendant asserts that entry of a preliminary injunction would severely disrupt its operations, resulting in projected damages of $110 million in expenditures and lost sales if it were ordered to cease selling Brawny towels with the patchwork embossing. Logic dictates that the greater the scope of an injunction, the greater the harm Defendant would incur, and this Court is cognizant of the economic effects to both companies that this case could theoretically present. Against this reality the Court is also aware that any essentially self-inflicted harm to Defendant that could result from issuance of preliminary injunctive relief should not excuse any improper actions by the company so as to preclude an injunction. *Cf. Pappan Enter. v. Hardee's*

17

*Food Sys., Inc.*, 143 F.3d 800, 806 (3d Cir. 1998) (holding in trademark infringement case that "a party's self-inflicted harm by choosing to stop its own performance under the contract and thus effectively terminating the agreement is outweighed by the immeasurable damage done to the franchiser of the mark"); *Midwest Guar. Bank v. Guaranty Bank*, 270 F. Supp. 2d 900, 924 (E.D. Mich. 2003) (holding that a party "cannot place itself in harms way, and then later claim that an injunction should not issue because of costs which it must incur in order to remedy its own misconduct").

There is little evidence beyond Defendant's speculation of apparent harm to third parties, although the Court recognizes that Defendant's customers would be involved in unstocking store shelves of Brawny and returning or destroying inventory. Such actions would consume time and money.

As the Court has noted above, both marks involved in this case have existed within the marketplace with no evidence of actual confusion and, at best, only a theoretical potential of any confusion–a potential that falls short of a likelihood of confusion. Plaintiff has not shown any irreparable harm it would suffer by continued coexistence that would decidedly outweigh the more tangible prospective harm to Defendant that issuance of the preliminary injunction would cause. *See, e.g., Frisch's Restaurant, Inc.*, 759 F.2d at 1270 (considering potential substantial costs to non-movant as factor in denying injunction). Although this conclusion is subject to change in connection with altered circumstances, the Court concludes at this time that the potential harm to Defendant outweighs the potential harm to Plaintiff.

**E. Public Interest**

Absent a likelihood of confusion, it is not within the public interest to grant an injunction

18

at this time.

## IV.  Conclusion

For the foregoing reasons, the Court **DENIES** Plaintiff's motion for a preliminary injunction.  (Doc. # 2.)  The Magistrate Judge shall therefore set this action for a preliminary pretrial conference as soon as is practicable.

**IT IS SO ORDERED.**

    /s/   Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE